This case starts out, as the prosecution, the government wants to play it, as a pill mill case. They talk about mainly two people, a doctor who's not here today, representing himself, who God knows how much he made doing this. There is a pharmacist who is a co-defendant here who had a plethora of money in her house when they raided it. So we come to my client, Mr. Thomas. Mr. Thomas was a man who ran a small pharmacy. One of his most important things was that he wasn't going to do what's illegal in this case. He wasn't going to deal with crooked doctors. He made it clear. The one doctor who's not here today, he didn't do business with. Cut him off. Not going to do it. Not going to be part of that crook. And so he did. And you will notice in the numbers, he filled a very small percentage of narcotics. His business was mainly run with regular medications. His percentage was considerably lower than the other pharmacist, Ms. Boo Boo, who had God knows how much money in her savings account, in her, excuse me, her, I believe her vault at home. And doctor, it was the strangest thing happened in the government's attempt to make its case against my client. They decided that they were going to start calling him a doctor. All through this case, the prosecution kept calling a pharmacist, a doctor. Two people with very different responsibilities. And I don't know why they did that. But they repeated it time and time again because they, I submit to you, because they knew they had a guy that was selling very little pharmaceuticals that were, excuse me, controlled substances. Was there an objection lodged at the time the government referred to him as a doctor? No, sir. You say it happened over and over again. It's obviously incorrect. Well, Your Honor, the word doctor and pharmacist was thrown around this case like 50 times. You're correct. There was no objection to it. But one thing that did become clear as the evidence was played out that he was a pharmacist. And nobody ever took process with that. Indeed, I will say this. For all the times the U.S. attorney said it, they would always have to go back and try to prove him guilty as a pharmacist who wasn't the big player. Boo-boos over there taking nothing but the big man. My client would not deal with the big drug dealing pharmacist, oh, excuse me, doctor who is not here today representing himself. And he was the one that loaded up in money and money and money in just doing this. He, it is perhaps the most strangest thing in this case when the district attorney gets up, I'm sorry, the prosecutor gets up at opening statement and says, we want you guys to follow the red flags. Here you go. First, almost the first instrument they give the jury, a list. And slowly but slowly, those begin to fall off the list when it came to my client, when it came to Mr. Thomas. In fact, Mr. Thomas would always follow the most important thing to the pharmaceutical folks, the PDP. He filed it religiously. There was no other evidence that he did otherwise. He always followed it that way. Counsel, you've got another three minutes, but I'm going to tell you that my concern in this case has to do with the question of mens rea.  I said my concern is in this case that with mens rea, the element of intent and the change in the law after this trial, this defendant was entitled to the benefit of that instruction, but they didn't get it. So what do we do? I don't hear you making that argument. No, Your Honor, we're making an insufficiency argument. If we're saying the evidence is insufficient to make out the elements, we're saying we don't care about a charge. It shouldn't get to a charge. When we're talking about, you're right. I understand that argument. I'll let you proceed. The government gets the message that I'm concerned about getting a jury to decide a case when an element of the offense is not included. That's my question. Well, Your Honor, I think you're going back and putting it too much on the jury. One of the most important portions, I'm sorry I'm saying this. You're looking at me. When they go through this, in the charge or going back to the charge, a charge may not rest on mere suspicion, conjuncture, or overly attenuated piling of inference on inference. And that's what they did. He hardly made any money doing this. He only had $1,000 in his hands. And, Your Honor, in a small pharmacy, things are completely different. That's not uncommon. People come in every day into a small pharmacy who can't fork over the money or fork over their insurance. He has to cater to those kind of people. And he wasn't the one, as in some of these other cases, that would go out and do the inviting into these things. He was stuck. When he would come to him, he would meet him, and he would treat him like any small pharmacist would. Your Honor, I think we have the right to have small pharmacists so that the ATVs who close at 5. By the way, I picked up one up at 505 the other day. Y'all can convict me. I guess I'm convictable. But these small pharmacies have got to do everything they can to make me shut up. Thank you, Your Honor. All right, Mr. Sullivan, you've saved some time for a moment. Mr. Page? May it please the Court? Kevin Joel Page for Ethel Oyukunle-Bubun. So how many of those are good arguments for you, Mr. Page? We are between 65 and 70 and never fails to quicken the pace, always humbly. Glad to have you back. I am, of course, pleased to discuss any issue that interests the Court in the case, but I would propose to begin with the issue of instructional error in the case. There was no objection. There is no objection. It is a plain error assertion. However, it is the kind of plain error assertion in which we are most likely to get through Prompt 2, which is where there is an intervening change in the law. There is no good reason to expect that a charge which was drafted with the Fifth Circuit law that predated Ruan in mind would match the holding of Ruan that was issued afterwards. So this is a case in which a plain error reversal is no judgment on the district court, but it is a case in which there is very likely to be instructional error because the judge and the parties were not apprised of the law at the time. There is a lot going on in this copious briefing between the parties. I want to point to one thing in the instructions that I think makes the question very easy and means that the Court does not need to reach quite a bit of it, which is a flat statement after both the substantive and conspiracy charges that a prescription issued outside the usual course of professional practice is invalid. And, quote, a person issuing such an order shall be subject to the penalties for violations of the Controlled Substances Act. That is a flat, clear, and independent statement that there is liability any time a prescription does not meet the regulations. It has – that statement has no requirement of mental state within it. So whatever else is in the charge, the most that we can say of it is that it contradicts that clear statement, which dispenses with the need for a mens rea for the pharmacist. And contradictory jury instructions are, under binding precedent, plainly infirm. When instructions authorize conviction without proof of an element, the prejudice analysis I submit should tread lightly around the jury's role. The jury is the circuit breaker in our democracy. It is how we ensure that the people have control over the actions of the government when it places people in prison. And so for that reason, this court should be especially cognizant of that portion of the substantial rights test, which says that you should reverse and find an effect on substantial rights when you cannot have confidence in the verdict, when the error undermines confidence in the verdict. And that, although it does – certainly does include a question of outcome, it is not solely a matter of outcome. It also takes into consideration the deprivation of the right to have a jury and not an appellate court decide whether the case is strong or weak. Having said that, I would like to move to the question of the sufficiency of the evidence on the substantive counts, counts 7 and 29. Count 7, but particularly count 7. Count 7 alleges possession of hydrocodone with intent to distribute it on November 29, 2019. This corresponds in the evidence to a prescription filled on that date for Cynthia Cooks. After Ruan versus United States, a conviction of a pharmacist for dispensing a controlled substance requires knowledge that the prescription is unauthorized. That is, the defendant must know either at a minimum that it is not medically indicated or that it was for an improper purpose. That means in the case of a substantive count, and particularly count 7, the government must prove the defendant's knowledge that it was not medically indicated for Cynthia Cooks. And there is not a bit of evidence in the record that the defendant knew anything at all about Cynthia Cooks' particular medical condition, nor about the health care and the diagnoses that she received at the clinic on November 29, 2019. Indeed, page 2092 establishes that this was likely the first visit or the very close to the first visit Cynthia Cooks ever made to the pharmacy. I don't know why they chose this count, but you cannot infer that there was a long course of interaction between Ms. Cooks and the defendant at the time that she filled the particular prescription that's in count 7. So there is no good reason to assume that she simply absorbed information about Ms. Cooks. On page 2120, there is evidence, undisputed evidence, that Cooks had previously received pain medicine from a legitimate doctor. She may well have presented as a person who was in need of pain medicine. And on page 668, we have a dispensing log from that date, 11-29-19, with two prescriptions. So it is not as though the evidence shows that she walked in with a large stack of prescriptions, and we can assume that she was distributing them on that basis. She came in on what appears to be her first visit with a prescription for pain medicine. There is no evidence that would tell us that the defendant knew that it was improper. She received a 90-month consecutive sentence for this count. There is no reason to believe that it did not affect the ultimately the sentence imposed. In any case, it would have to be vacated. The government's answer to this is essentially to reiterate all of the evidence that it has that is intended to show that the defendant knew that Dr. Capistrano was issuing bad prescriptions that were not medically indicated. But knowledge that even if we take that for all it's worth, knowledge that a defendant knows that a pharmacist knows that a doctor issues many bad prescriptions is not knowledge that this one particular prescription issued on one day, on the first day you meet the patient, is bad. It simply does not support that inference.  Thank you, Mr. Page, and you've saved time for rebuttal. Mr. Magliolo. Thank you, Your Honor. May it please the Court? Joe Magliolo from the United States. Your Honor, I'd like to start with Ruan because I think what is missing from Mr. Page's presentation is a discussion of the recent Ajaye decision. And just to put Mr. Ajaye in context, he was a co-defendant in this case. He was a co-owner of one of the pharmacies at issue with Mr. Thomas. He was tried separately. The jury charges in Mr. Ajaye's case and in Ms. Bubu's case are functionally identical. The element language for the conspiracies, for the substantive case, for the Title 21 instructions and definitions are identical. That case, rather, has recently been published and is binding on this Court, of course. Conspiracy language, I think, is the language that most clearly comports with Ruan because it required the jury to find that the defendants had a culpable mental state. In other words, they joined a conspiracy, the purpose of which was to dispense controlled substances outside the course of professional practice and without a legitimate purpose. They did so knowing the purpose of the conspiracy. But if you had had the Supreme Court's decision in Ruan, then you would still maintain that if it were disregarded, that the same instruction was given here, there would be no error, no plain error. I think there would be no plain error. It perhaps could be a slight bit clearer. But the upshot of Ruan, Your Honor— See, the difficulty I'm having is that there's a fundamental right to a jury trial. We don't have summary judgments on the criminal side. There's a lot of difference between the civil and the criminal side. And the role of the jury is fundamental. And when you fail to instruct the jury on the essential elements, where intent is all over this case, affirmatively, I have difficulty with that. Because it really takes away the opportunity of the jury to make its own decision. The jury may have had a very different take on this, but they weren't given the instruction. I've seen this problem of curative intents where you have—for example, I've seen the criminal side of antitrust cases where you have a failure to instruct a jury that this is a per se violation of a violation of whatever. And then the question is whether there was curative evidence. On the criminal side, that won't work. Because the jury doesn't have the element. Well, I appreciate that, Your Honor, although I disagree that they didn't have an element. Again, post-Ruan, the instruction probably looks slightly different. But particularly concerning the— I agree with you. I'm going to talk about the principle of the role of the jury. That's my concern. Excuse me. I certainly appreciate that, Your Honor. I have the same feeling, but I think in this case the jury did not miss an element, particularly with respect to those conspiracy counts. Because the upshot of Ruan is that the government must prove that the defendant knew a prescription was unauthorized. Well, how is a prescription unauthorized? It's under 21 CFR 13 and 6.04, which is to say that a prescription has to be issued for a legitimate medical purpose and in the usual course of professional practice. So if jury instructions force the jury to find a culpable mental state as to the defendants, as to those two elements, then I don't think that the instructions are deficient under Ruan. And I think that the conspiracy language here absolutely, for the reasons in the published JIA decision, absolutely captured that meaning. Now, I appreciate the substantive drug counts, the two substantive drug counts, are not quite as clear on that. Your argument is that functionally they did get a mens rea instruction. Absolutely, Your Honor. Absolutely. All right. I take it from that that – well, you can see that if that absent at least a functional mens rea that you can't stand on that verdict. In other words, the omission of mens rea instruction would be a fatal error. As a general matter, of course, Your Honor. It would be. Yes, Your Honor. So the argument then boils down to the fact that whether or not the jury instructions sufficiently focused the jury on the element of mens rea. Yes, Your Honor. All right. And three conspiracy counts, two substantive drug counts. Three conspiracies are language identical, and I think the mens rea is clear as day as the previous case. Now, I appreciate that the substantive count instructions are not quite as fulsome, at least in the light of the law. But I think there's four different ways to affirm those substantive counts, and I'm happy to get to the sufficiency of the evidence on it later. First, I think the language itself in a charge. Again, I agree it is not as focused on the mental state as a conspiracy. But there's still a knowing or intentional possession with intent to distribute a controlled substance. And in this case, that's defined as possession with intent to distribute is defined as either without a legitimate medical purpose or outside the course of usual professional practice. Those are the two authorization elements that permit practitioners like Ms. Booboo, like Dr. Capistrano to legally prescribe these drugs. And as a result, I still think the mental state attaches in that case to the actus reus here. Now, I appreciate that the Magia courts didn't reach it. That was a little bit less enthusiastic about that language. But there's three other ways to get there. How was it phrased in the conspiracy counter to an agreement? You knew that this was an agreement to sell these drugs, to dispense these drugs. And of course, the law is that they can't legally do that. Correct. So yes, a knowing agreement to enter into that. Knowing it's unlawful and with the intent to further the unlawful purpose. Okay. Okay. Concerning the substance counts, there's other methods of affirming if the court doesn't agree with me that the plain language of the jury instruction is sufficient under the law. The first is finding Pinkerton liability precisely like the Magia court did. I will concede I did not brief this. This is an argument that was raised in the Magia case. But it is a basis in the record for the court to affirm. And that's because the acts that underpin the substance counts against Ms. Boo Boo, Count 7 and Count 22, were possession with intent to distribute hydrocodone and the muscle relaxant. And the evidence for that is both in Government Exhibit 8E and 11, those are the prescriptions. And the testimony of Cynthia Cooks, who was both a patient recruiter and a recruit, who testified that she purchased these drugs. She obtained them. She obtained them from the patient recruits, Mr. Parks and Ms. Parrish. She might use some, but then she would sell the rest. As a member of a conspiracy of the object, which is to dispense these drugs illegally, it's absolutely reasonable and foreseeable for someone like Ms. Boo Boo that this sort of thing would happen. And these were always for cash and in inflated prices, is that right? Absolutely, Your Honor. Absolutely. And the Pinkerton liability as a result of those facts and others, I think, can absolutely attach. And a better liability for the same reasons can also attach. But I think even if the court finds that the jury instructions are wrong under Rule 1, which I do think would create a conflict with the GIO, but setting that aside, the harmlessness argument here is very strong for the same reasons. The sufficiency argument against Ms. Boo Boo is strong. Judge Smith, as you pointed out, the red flags as to Ms. Boo Boo were complete. She was charging market prices or below market prices for all of the drugs in her pharmacy except for hydrocodone, muscle relaxant, and promethazine with codeine. The pharmacist in her pharmacy, Ms. Gonzalez, tried to do something like a pharmacist should do, fulfill their duty, called the doctor Capistrano. Ms. Boo Boo got very mad at her. The other red flags in this case was Ms. Boo Boo. She took cash only, even if there was health insurance. She was dealing directly with drug dealers. She was texting drug dealers about prices. She asked this drug dealer to take the money or the labels off of his bottles so as to separate herself from his conduct. There was $80,000 in cash found in her safe at home. There was a 2018 report that indicated that Ms. Boo Boo was filling fraudulent prescriptions. She was overfilling promethazine prescriptions, overfilling hydrocodone, and she continued this same sort of behavior unabated. Fast forward to 2020, and we have an inspector who tries to get in. He can't get in. Ms. Boo Boo was texting with her son to try to conceal evidence and try to conceal boxes of promethazine to obstruct this investigation. There was this huge missing amount of promethazine with codeine for which Ms. Boo Boo can't amount, which I calculated equals up to conservatively 500 separate bottles, the street value of which is over half a million dollars. So you have all of this evidence, the text messages, the inspections, and then you have several experts testifying that Ms. Boo Boo is not fulfilling her duty that these pharmacists have. She's supposed to be a gatekeeper, and she's getting these pattern prescriptions from someone like Dr. Capistrano, and that's another reason that this Mr. Page's argument about Count 7, I think, falls short. On top of being built upon a number of suppositions, the evidence in Count 7 is that Ms. Cooks was a patient recruiter. Now, it may have been one of her earlier times, but she brought these prescriptions in from a person, Dr. Capistrano, who only sold drugs of abuse. So a pharmacist, when they get a prescription from someone like Dr. Capistrano, ought to do what Ms. Gonzalez did, call up and make sure it's okay. But Ms. Boo Boo obviously didn't want to do that because it was such a lucrative practice for her. And as the other substance, it's only for muscle relaxing, but the prescriptions at issue were for these three drug cocktails that Ms. Boo Boo was so fond of prescribing, hydrocodone, muscle relaxing, and promethazine with codeine, the sort of thing that Ms. Gonzalez said would cause respiratory depression, the sort of thing the expert said should never be prescribed together. So there's a lot of ways to get there on the substance of Count 7, even if the court finds jury instruction there. And the evidence against Ms. Boo Boo, I think, is overwhelming. It strikes me as being very similar to the quantum of evidence against the pharmacist defendants in the United States v. Brown v. Hilton in 2008. The parallels are striking. You have another situation where doctors are overprescribing drugs of abuse, selling drugs out of the back door, taking labels off, taking over cash. And in that case, just like here, the defendants argued that they couldn't be convicted because they didn't know why a doctor prescribed what they prescribed. They're basically hiding behind the notion that it looks like a valid prescription, so I should be allowed to fill it. But the testimony in this case, what the evidence in this case, what the law says, what the regulation says, is that pharmacists have a duty and they have a gatekeeper role and they see things like what Ms. Boo Boo saw time and time again. They should be wary of filling that sort of prescription. I'd like to turn to Mr. Thomas' arguments and Judge Higginbotham raised. I grew on with Mr. Thomas, Mr. Thomas' counsel, and I think it's clear that he's waived that argument. He hasn't brought it up in any of the briefs. He didn't even bring it up today, and so I believe he has fully waived that argument. As to the substance of his argument, I must admit I am mystified a bit about the argument about the doctor. It's not something I've heard before. In any event, I don't think that it much matters. The notion that Mr. Thomas was a small-time doctor not dealing with a criminal is belied by the record. It is true that Mr. Thomas would not take the Capistrano prescriptions because, in his view, Dr. Capistrano was too hot. Instead, he took prescriptions from Dr. Capistrano's partner, Dr. Noel, who was equally corrupt and convicted in the same case. And in terms of volume of drugs that he took versus Ms. Boo Boo, in only a two-year span or less than two years, Mr. Thomas filled 40,000 units of hydrocodone from Dr. Noel, where Ms. Boo Boo filled only 10,000 from Capistrano and Noel combined, and about 80,000 units of promethazine codeine cough syrup, which is seven times what Ms. Boo Boo filled from the same exact clinic. So the fact that there's less red flags doesn't mean that the degree of the red flags isn't very high. His clinic was 25 miles away from Capistrano and Noel, or his pharmacy was 25 miles away, which both research and common sense would indicate no person would rationally go that distance for a pharmacy if there wasn't an illicit purpose like there is here, at least not on a consistent basis. And he's making arguments much like this court rejected in the United States versus Achebe, which is a 2008 decision from a co-defendant to the defendants in Brown. He made the arguments and Mr. Thomas is making here. It's those pharmacists were corrupt because they were so brazen about what they did. I wasn't because I was a little bit more careful. And what the court wrote in that opinion was the evidence could rightly be seen as a person following the law, but it could just as easily be seen as a defendant being a careful criminal. And that's precisely what he did here. And I think it's worth noting the record indicates that the Remcare pharmacy, of which Mr. Thomas was a co-owner, did take prescriptions from Mr. Capistrano, which just wasn't the primary focus of this case. So the evidence makes Mr. Thomas very, very strong against these red flags. There's text messages with Mr. McCade, a patient recruiter in this case. He lied about that to investigators. He talked about certain patient recruits. He's also caught on wiretaps talking about filling prescriptions after hours, giving drugs on assignment, taking money in cash, and also using drug code, like saying this is the ticket, and all of that together is indicative of a drug dealer. And if nothing else, it doesn't come close to meeting the high burden that Mr. Thomas must meet in order to show the evidence is insufficient against him. If the court has no further questions, I'm happy to see the balance of time. All right, thank you. I just have one further question. Yes, sir. Was this a pattern of instruction on Section 2 or that is a standard conspiracy instruction? It was a standard drug conspiracy instruction, but modified, Your Honor, because the standard drug conspiracy obviously doesn't account for the people who are otherwise authorized to dispense these types of drugs. So it utilized language from the 1306.04 CFR regulation that authorizes practitioners, which is— Well, I'll certainly go back and take a look at that precise language. So there is a—I'll make one more suggestion to you so you can—I won't get your pushback on it because I'm expressing my concerns. Conceptually, you can ask whether people have knowingly joined in a course of conduct, obviously. And then the question is, have they knowingly joined in to this agreement to sell these properties and so forth. That still leaves a window for the question of, depending on how this is framed, as to whether or not you have an adequate instruction from the jury of the intent. Because we know that the omission of the element would be the falling off thing. I'll follow you on your emotional argument, and I'm not challenging it. I'm just trying to figure out a little more tightly why you have three minutes to deal with it. Oh, I appreciate, again, your concern about there being a mental statement. I think the AGIA court got it right. The elements in this case were that the defendant reached an agreement with at least one other person to dispense a controlled substance, both without a legitimate medical purpose and outside the course of professional practice. It did so knowing the legal purpose of the scheme, and they joined in it willfully, which is to further its unlawful purpose. And then finally, the fourth element, that it involves some amount of the jury. And so it's got knowing language. It's got willful language. Knowing the unlawful purpose of this conspiracy, which is to dispense drugs without authorization. But it's not an argument. The sufficiency of the evidence really doesn't answer the overwhelming case. It doesn't really answer the question. It has to do with the argument you're making. It either doesn't function, and you may be right, or sometimes I suggest it one way or the other. I'll put it to you. That's where, to me, the case bill is itself, whether or not I misinterpreted the way it was actually put to the jury itself. I certainly appreciate that, and I will say this is not a situation where there's an absence of mixed language, particularly in the conspiracy language. And if the court is discontent with the substantive language, which is different, I think that it can easily affirm on Pinkerton liability. All right. I got you. Thank you, Your Honor. All right. Thank you. Mr. Sullivan for a vote. Yes, Mr. Sullivan. After all I've heard, after all the record I've heard, I'm still not convinced that Mr. Thomas is anyway one of the drug dealers that was involved with this thing. The red flags don't belong to him, and they started that way. And as the evidence started developing on him from their own witnesses, Mr. Kincaid, who turned out, he said, no, this is a guy that played it straight up. This is a guy that played by the rules. The government had to change its strategy. They had to read to the jury in dramatic fashion at the end of the evidence when no witness can stop and explain the language that they're using. He used words like receipt, I think. He used words like money. I've quit saying those words with my pharmacist, just so I'm clear. I'm asking for no more receipts, and I'm playing with a credit card. But, Your Honor, once again, if they want to do that, that closing argument is their zinger to get to their own witness, who said that Mr. Thomas was a guy that played by the rules straight up. He wouldn't work with the main criminal doctor in this case. And, yes, the other one was a criminal, but was a much smoother one and was mainly doing business with Ms. Boober. I got 12 seconds. I thank you for your time. This is a 74-year-old man, my client. That's why I did not file any other claims but for sufficiency of the evidence. All right. Thank you, Mr. Sullivan. We noticed that you're court-appointed, and we appreciate your willingness to take the appointment. I had fun. Thank you, Your Honor. Okay, Mr. Page, rebuttal. May it please the Court, my extremely ambitious agenda would be to cover four points in my rebuttal, but I'm also happy. I recognize the Court's questions may be more pertinent than my plan. The first point I want to make is to explain why I don't think Pinkerton liability can fix Count 7, neither as a matter of sufficiency of the evidence nor as a theory of harm in order to fix the deficient instructions on the substantive counts. The first reason that Pinkerton can't fix the problems that the government has with Count 7 is that there isn't sufficient evidence that any co-conspirator committed all the elements of Count 7. Dr. Capistrano never handled the drugs, so he didn't possess them with intent to distribute them. And Cynthia Cooks did handle the drugs, but page 2085 of the record establishes that she also took hydrocodone. She was an addict to hydrocodone, so the record does not establish that she was receiving hydrocodone specifically in order to distribute it. So because there is no co-conspirator that committed Count 7 particularly, this Court cannot conclude either that the evidence was sufficient through Pinkerton liability, nor that the evidence certainly was overwhelming of Count 7, such as to fix the plain error in the substantive counts. The second point I want to make is that a JIA, whatever else it says, it does not hold that the instructions for the substantive counts in the case are adequate. It merely resolves the substantive counts on the question of harm, but of course it doesn't bind this Court on the question of harm or prejudice. We have different facts in a different record here. So a JIA does not stand for the proposition that the substantive charges are adequate in this case. The third quick point I want to make is the government attempts to cite, well, it does, it succeeds in citing Brown, to show that the substantive counts are adequate. Brown, the 2008 case, predated Ruan. So what it stands for is the proposition at most that similar evidence could show a substantive count before the government had to prove that the defendant knew that a particular prescription was medically unauthorized, which it now must do after Ruan. Finally, I want to point to the government's argument that because Capistrano only sold drugs of abuse, the defendant should have known and should have called. That is a recklessness standard that shows that the defendant was at most reckless about the possibility that this was not a medically authorized prescription, not that she actually did. Thank you. Thank you, Mr. Page. Your case is under submission. Next case, United States.